The **TEXAS AND PACIFIC RAILWAY COMPANY, Appellant,**

v.

**EMPACADORA DE CIUDAD JUAREZ, S. A., Appellee.**

No. 5242.

Court of Civil Appeals of Texas.

El Paso.

Nov. 6, 1957.

Rehearing Denied Jan. 15, 1958.

Second Rehearing Denied Feb. 19, 1958.

J. F. Hulse, Scott, Hulse, Marshall & Feuille, El Paso, for appellant.

Andress, Lipscomb, Peticolas & Fisk, El Paso, for appellee.

WILLIAMS, Justice.

This suit was brought by plaintiff below, appellee herein, against defendant below, appellant herein, for damages arising out of the spoiling of a shipment of so-called cured beef by plaintiff from Juarez, Mexico, to Jamaica, New York. Plaintiff is a meat packing corporation of Juarez, and had shipped many such cars of meat over defendant railroad, and this is the first car out of which arose any trouble. The undisputed evidence shows that plaintiff shipped this car of beef on July 28–29, 1952, and that defendant railroad received it in El Paso about four o'clock in the afternoon on July 29th, and undertook to carry it to Jamaica, New York. It was stipulated that it was of no value when it arrived in New York on August 5th. There were some 48 issues submitted to the jury, all of which were found in favor of plaintiff-appellee, many of which, in our opinion, were not supported by any evidence, or were contrary to the overwhelming weight of the evidence, as will be discussed later. There are 43 points of appeal and the record is rather voluminous, so we will attempt to discuss the testimony relative to the respective points as we progress. All of the issues were supported by the pleadings, so we will usually refer to the issues rather than to the pleadings.

■ The jury found that the defendant railroad furnished the car in which this meat was carried. Appellant railroad strongly assails this finding, and we agree with appellant. There was introduced in evidence a letter from Mr. Villalobos, manager of plaintiff-appellee, ordering two cars to be spotted on July 21st. Mr. Villalobos testified that the cars were spotted on this date by said railroad, and that the Mexican-Northwestern Railroad furnished the car in which this meat was shipped. We think this is an admission on the part of the plaintiff and is binding on it: Bergeron v. City of Port Arthur, Tex.Civ.App. Waco 1954, 264 S.W.2d 769 (n. r. e.)

The only evidence to the contrary came from Mr. Joseph H. Brown, plaintiff's broker, who testified that he telephoned defendant-railroad to furnish this car; but, on cross-examination, Mr. Brown admitted that his call very likely was after the car was loaded, and was to ask the railroad to expedite its movement. He further categorically testified that Mr. Villalobos ordered the car. We hold, as a matter of law, that the car was furnished by the Mexican-Northwestern Railroad, and not by defendant railroad.

■ However, we agree with plaintiff's contention that the defendant railway was the initial-through carrier. The evidence in this regard shows that the Mexican-Northwestern Railroad received the car from the shipper, transported it to El Paso, and with the assistance of the switching concern in El Paso, placed it on the defendant's track about ten o'clock in the morning of July 29th. About four o'clock that afternoon, Dr. Hamilton, a United States government inspector for the Bureau of Animal Industry, and Customs agents, together with broker Brown, inspected the car. Dr. Hamilton found the meat in satisfactory condition to pass his inspection, although we must say that his inspection was very skimpy. The car was thereafter turned over to the defendant railroad, and it issued its through bill of lading agreeing to carry the cargo from El Paso to Jamaica, New York. We therefore hold that the defendant railroad became the initial-through carrier, although the meat was being shipped by and from a foreign origin: 8 Tex.Jur. § 725, p. 1011 et seq.; Houston, E. & W. Tex. Ry. Co. v. Houston Packing Co., Tex.Civ.App. Galveston 1919, 221 S.W. 316 (ref.).

■ The plaintiff alleged that, (1) it furnished defendant railroad this meat in good condition, and that it arrived in New York in bad condition, and it contended that, under the Carmack Amendment, 49 U.S.C.A. § 20(11), and under the common law, the prevailing presumption made the defendant liable for the spoilage of this meat. The authorities are uniform in holding that, under these circumstances, a presumption of negligence prevails and places liability on the railroad. (2) In the alternative, plaintiff alleged specific acts of negligence on the part of the railroad, which were, in the main, (a) that the car was defective in that one of the doors was loose and ill-fitting; and, (b) that the car in question was defective because the canvas and stiles around one of the doors was defective and rotten, and that the defectiveness and rotten condition was old. We will discuss these two propositions in order.

### (1)

The jury found that the meat was furnished to the defendant railroad in good condition, and it was stipulated that it was of no value when it arrived at its destination in New York.

For support of the proposition that the meat was delivered to the defendant in good condition, plaintiff relies very largely on the testimony of Dr. Hamilton, the B. A. I. inspector. Dr. Hamilton testified that he inspected the car in El Paso about four o'clock in the afternoon of July 29th, and that the meat looked all right to him, and he passed it for shipment. He testified that he looked at only one carton of the 400 cartons, and that it looked all right;

that he looked for leakage on the floor and found none, and that, had the meat been spoiled, he thought that he could have detected that condition by his sense of smell. To establish that the meat was not in good condition, the railroad placed no witnesses on the stand, but relied on cross-examination of the plaintiff's witnesses, and it is certainly well established by them that it handled the meat before shipment in a very imprudent and unusual manner. They admitted that they handled this shipment differently from any of the other two or three or four hundred cars that they had shipped. They admitted that the temperature of a car should be lowered to 20 or 22 degrees before loading, and that it should be iced for at least two days before loading began. In this instance the temperature of the car was 36 when they began to load, and had been iced, at the most, for some four or five hours. When they finished loading, the temperature of the car was 62 degrees, and some two and one-half hours later it was 48 degrees. All of their witnesses testified that meat should be kept at a temperature of 32 or 33 degrees, and certainly never higher than 34 degrees. They admitted that some 25 or 30 per cent salt content should be added to the ice in the cars, whereas they added only 15 per cent to this car. In the face of this testimony and other of a similar nature, the jury found that the plaintiff was not negligent in any of these manners in which it handled the meat, and that the meat was in good condition when delivered for shipment. The plaintiff's witnesses also testified, on cross-examination, that spoilage once begun by reason of the temperature being too high could not be detected by examination soon thereafter, but that the bacteria in the meat would start to working when raised to too high a temperature, and some said that they would not stop working when the temperature was brought to a proper stage. We therefore think the testimony as to the meat being in good condition when delivered is certainly very unsatisfactory. Too much weight cannot be given to Dr. Hamilton's testimony, as

plaintiff's expert testified, as mentioned above, that the spoilage may have set in, and that same would not be detectible by a visual inspection such as Dr. Hamilton gave it. Judge Norvell discusses, in Thompson v. Bob Tankersley Produce Co., Tex.Civ. App. San Antonio 1956, 289 S.W.2d 840, 841, the difference between "good condition" and "apparent good order." In this connection he says:

> "On the other hand, it seems well established that receipt in apparent good order by the carrier, coupled with the inability to ascertain hidden defects by visual inspection, does not preclude a holding, as a matter of law, that a commodity was not in good condition when received by the carrier."

The cases cited by Judge Norvell are likewise very interesting. See also, St. Louis & Southwestern Ry. Co. v. Grant, Tex. Civ.App. San Antonio 1915, 174 S.W. 714. The other evidence on the subject is to the same effect, to-wit, that the meat "appeared" to be in good condition. In view of the evidence in this case, especially the admission of plaintiff's officials that they improperly and imprudently handled this meat before and while loading, we hold that there was insufficient evidence for the jury to find that the meat was in good condition when delivered to the carrier in El Paso. This rules out the presumption and brings us to the allegations of specific negligence.

(2)

■■■ (a) The jury found that the door of the car was "loose-fitting." Absolutely the only testimony on this subject came from Mr. Zinn, who was manager of the consignee. He said that he was present when the seal of the car was broken in New York, and that the doors appeared to be in good condition to him, but that one of them did not appear to be "tightly closed." On the strength of this meager testimony, the jury not only found that the door was "loose-fitting" in New York, but found that it was "loose-fitting" on

July 21st when it was furnished to the plaintiff shipper in Mexico, and found that it was "loose-fitting" when it left El Paso. The car was not loaded in Mexico until July 28th and, of course, the door was standing wide open when it was being loaded. Certainly the jury's findings that the door was "loose-fitting" in Juarez and in El Paso are absurd. We say this because, as mentioned above, the only testimony was that it was not "tightly closed" in New York. There is not one word of testimony about whether it was tightly closed in El Paso and, of course, while in Mexico being loaded, the door was necessarily wide open. Furthermore, Mr. Zinn does not say whether he discovered that the door was not "tightly closed" before or after he broke the seal. He does not say whether he could have discovered this situation before he broke the seal, so it cannot be said that appellant was negligent in not discovering the situation while the door was sealed, even if it existed. Neither does he say to what extent the door was not "tightly closed." He does not say that it was loose to an extent that air could escape from the car, nor does he say whether or not the door was in such a condition that it could have been tightly closed. There is absolutely no explanation of what he meant by not "tightly closed." We therefore hold there was absolutely no evidence on which to find that the door was "loose-fitting", either in Juarez or in El Paso. This is not too important, as the initial carrier would be liable if it became defective en route and it had furnished the car, or the connecting carrier was negligent in not discovering the defect. Note that we are here concerned with allegations of specific negligence: Texas & P. R. Co. v. McMillen, Tex.Civ.App. El Paso 1916, 183 S.W. 773 (no writ history).

But this does show the reckless manner in which the jury answered the issues. It is also important to note that there is no explanation of what was meant by not "tightly closed."

The defendant railroad placed in evidence the icing record that it kept on the movement of this car from El Paso to New York, and no contention is made that it was not properly iced. Likewise, there is no contention made that the railroad did not carry the car expeditiously. There is no showing that the railroad did any negligent act in the movement of the car from the time it received it until the time it arrived at its destination. However, it seems this would not extricate the railroad from liability under the presumption above mentioned, had the merchandise been received in good condition: 8 Tex.Jur. § 267, page 394.

It seems settled law that, for the railroad to relieve itself of liability after it received goods in good condition and delivered them in bad condition, it must show that the damage was caused by some negligence for which it is not responsible (or act of God, etc., which is not here involved.) See foregoing authority, where it is said:

> "It is, of course, overcome by proof that the damage or delay was occasioned by a cause for which the carrier is not responsible. But it has been decided that proof that nothing happened or could have happened to communicate fire to a shipment while upon a moving train is not sufficient to rebut the presumption of negligence; also that proof of use of proper care in the equipment and operation of engines will not rebut the presumption arising from the fact that fire escaped from an engine and destroyed goods in possession of a railroad as a common carrier."

In this case, it will be observed that the jury found that the spoilage was caused by the faulty car, which the defendant furnished. As above shown, we hold that the defendant did not furnish the car; but still, under the authorities, it seems that even a connecting carrier owes the duty to inspect the car to see that it is not faulty. All of the authorities hold that, under these circumstances, there is a duty to inspect, but that that duty is to make a "reasonable inspection" in order to discover defects. In

this case, the undisputed evidence shows this car was placed on the defendant's tracks about ten o'clock in the morning of July 29th, but was not released for movement by the defendant until the Government inspector, Dr. Hamilton, broke the Mexican government seal, inspected the car, and placed a United States government seal on same. This was done about four o'clock in the afternoon of July 29th, while the car was on the defendant railroad's tracks, but there is not one word of testimony as to whether or not the defendant even knew the car was on its tracks—certainly nothing to show even a constructive acceptance. The bill of lading was not accepted by the defendant railroad until after four o'clock on July 29th, after the Government inspector, Dr. Hamilton, had sealed same with a Government seal. The law did not authorize the railroad to break the seal and, furthermore, the bill of lading on which this shipment traveled specifically stated that the seal would not be broken by the railroad. Therefore, we take it that the railroad did not receive this car until it executed the bill of lading, after it had a Government seal on it. 9 Am.Jur. § 371, p. 652, et seq.

■■■■■ (b) The jury found that the canvas around the doors was rotten, and that the door stiles were rotten when the shipment began, and that defendant-appellant railroad was negligent in not discovering the condition, and that said condition of the doors and defendant's negligence were proximate causes of the spoilage. The only evidence in the record that the canvas around the doors, and the door stiles, were rotten, came from Mr. Weismer and Mr. Gass, both of whom were car inspectors for another railroad, and this inspection by them did not occur until August 23rd. Both of these men testified that they had no independent recollection of the inspection of this car, but their official records showed that the canvas was rotten and the stiles were rotten, and that this condition appeared to be old. From this, the jury was required to reason and

find that it was bad in El Paso and bad in Juarez, some three weeks prior thereto. In this connection, Mr. Weismer further testified:

"You see, we have to open the doors to observe the canvas both on the door post and underneath the door and up on the side, and naturally when you open it you see if the canvas is rotten or torn or anything of that sort. The canvas was rotten"

This brings us to a very important issue in this case—as to when the duty on the railroad arose to inspect—because without a duty to inspect, there can be no negligence in not inspecting. El Paso City Lines, Inc. v. Sanchez, Tex.Civ.App. El Paso 1957, 306 S.W.2d 396.

Although this car was on the defendant's tracks when inspected by Dr. Hamilton and the Customs agents, there is absolutely no testimony that the railroad even knew it was there. We therefore consider that it did not receive this car or have any connection whatever with it until it executed the bill of lading that afternoon after the Government seal was placed upon it. We further hold that the railroad's duty to inspect did not arise until it accepted the car. Mr. Weismer further having testified, without dispute, that the rotten condition of the door sills, etc., could not be detected without opening the car, we conclude that the evidence is insufficient to support the finding of negligence on the part of appellant in failing to inspect, and in failing to discover the defects, if any. The jury found that the defect in the door did exist and that that was the cause of spoilage of the meat. Therefore, it is established that the negligence which caused the loss was that of someone other than the defendant, and that the defendant was not responsible for same. This requires that the case be reversed.

■■■■ Plaintiff-appellee argues in his brief that the railroad could not avoid liability on the theory that it was under no duty to break the seal on the car and ex-

amine same, and cites for this position 13 C.J.S. Carriers § 420, at pages 918 and 919. The same authority recognizes a contrary view, especially when there is a Government seal on the car which cannot be broken by the railroad lawfully. For this position it cites Davis v. Standard Rice Co., Tex.Civ.App., 293 S.W. 593, 598, a Texas case. Part of it is as follows:

"The undisputed evidence in the record further shows that there were no apparent or visible defects in the car, and the leaks therein, if any, could only have been discovered by an inspection from the inside. The car was sealed and the Texas & New Orleans Railway Company was not required nor authorized to break the seal for the purpose of inspecting the car from the inside; there being nothing in its outside appearance to indicate its defective condition." .

The Court of Appeals at Galveston first affirmed this case, but, on motion for rehearing, when its attention was called to the fact that this was a Government seal which the railroad was not authorized to break, it reversed its position and held for the railroad as above indicated. In this case, the railroad was a connecting carrier, but we think it makes no difference here, since in our case the railroad received this car from another railroad after it was under the Government seal. The only thing that makes it an initial carrier is the fact that it issued a new bill of lading and undertook to carry the car from El Paso to New York. The railroad, whether it be "initial" or "connecting" carrier, must make a "reasonable inspection."

In 9 American Jurisprudence, section 338, page 632, it is said:

"Nor is a railroad company relieved from liability for injury caused by the use of a defective or unsuitable car for transporting freight by the fact that it was furnished or transferred to it by a connecting carrier. In some jurisdic-

tions, however, the view is taken that the liability of a carrier for failure to furnish suitable cars, whether they are its own or those of a connecting carrier which come to it with their freight, is not an absolute liability, but only results in case of its failure to exercise due care, skill, or diligence."

One of the footnotes is as follows:

"In Higgins & Co. v. Chicago, B. & Q. R. Co., 135 Minn. 402, 161 N.W. 145, L.R.A.1917C, 507, it was held that a carrier receiving a shipment from a connecting carrier loaded in cars which were improper was not liable for damage resulting to the shipment while in its possession because it continued the shipment in such cars, where it did not know of such improper condition, and such condition was not discoverable by the exercise of due care, skill, and diligence."

Furthermore, the jury found that the defects in this regard were not "open, obvious and apparent to a person in the situation of the plaintiff, exercising ordinary care, particularly while loading said car." Therefore, it would be preposterous to say that a reasonable inspection by the defendant railroad, after the car was sealed, would have revealed these defects. We therefore hold that a reasonable inspection would not have revealed these defects, and that the defendant railroad was not negligent in not discovering them. This ordinarily would dictate that the case should be reversed and rendered in favor of the appellant railroad, the jury having found that the faulty door caused the spoilage; but we do not think that justice would best be served by this action. Since the evidence, and especially the jury findings, are in such unsatisfactory condition, we think justice would better be served by our reversing and remanding this case for further trial. For a discussion of our rights and duties in this regard, see 26 T.L.R. 808; Hicks v. Matthews, 1954, 153 Tex. 177, 266 S.W.2d 846.

Wherefore, this case is reversed and remanded for a new trial.

FRASER, Justice (concurring).

I agree with the overall holding of the majority, wherein it holds that the ends of justice and the rights of the parties would be better served by another trial of this controversy.

However, I cannot agree with some of the holdings set forth in the majority opinion. For example, the majority here holds that there was insufficient evidence for the jury to find that the meat was in good condition when delivered to the defendant carrier in El Paso, and that such rules out the presumption of negligence. While it is true that plaintiff's employees violated many rules which they, themselves, had enunciated as being necessary to proper handling of this kind of merchandise, there still remains no evidence whatsoever, other than suggestion, that the meat had started to spoil before it left El Paso. There is not a single word to that effect. Now the meat had to be either good or bad, and the witness, Dr. Hamilton, testified affirmatively that, in his opinion, it was good—at least as much of it as he examined. This was positive evidence of probative value, and the jury believed it. It is entirely possible that the meat had begun to spoil, but, again I repeat, on the basis of the record before us, this can only be speculation resulting from suggestion. Such is not evidence. Therefore, I do not feel that the majority opinion is correct in its holding, for the only evidence relative to the condition of the meat in El Paso was that it was good.

Secondly, it does not seem to this writer that the case of Davis v. Standard Rice Co., Tex.Civ.App., 293 S.W. 593, is similar to this controversy. The defendant in the Davis case was not an initial carrier, but an intervening carrier. This case was decided some thirty years ago. It was the established law, at the time the facts arose in the present controversy, that the initial carrier is primarily responsible for any acts or failures of intervening carriers. If defendant in the Davis case accepted a faulty car, it did so, not initially, executing its bill of lading therefor, but as a link in the transit. Under the present status of the law, the initial carrier is primarily responsible for the shipment, including negligence of intervening carriers.

Lastly, it does not seem credible that a railroad, in the face of the legal presumption of negligence when goods, fit when accepted, arrive at destination in unfit condition; would, as the initial carrier, accept a carload of highly perishable merchandise, such as meat, and agree to transport it approximately two thousand miles, in the midst of the hot summer weather, without at least some inspection of both the cargo and the refrigerator car. If Brown, the broker, could go in and look at the car before it was finally sealed, of course the railroad could have had its inspector there, too. Much has been said about the duty to inspect, and it must be admitted that the briefs do not settle this question, nor have we found any adequate legal disposition of same to serve as precedent or example. It seems to this writer, for a railroad to act as the record here indicates it did,—to-wit, entered into a bill of lading contract to ship perishable meat thousands of miles in hot weather,—without checking the meat or the car, was not only negligent, but certainly took a calculated risk, in view of the presumption that might well come into effect. As to a duty to inspect, it seems clear that the railroad should owe this duty under the facts in the record before us, because they assume the responsibility, as initial carrier, of transporting this cargo. How can they discharge that duty unless they use proper equipment; how do they dare to do it without at least seeing if the cargo is fit before they start? Therefore, this writer believes that an initial carrier is under the duty to make a reasonable inspection, at least of the equipment it plans to use in hauling the cargo under the terms of the bill of lading under which it expects to be paid for this service.

With reference to the matter of inspection, the majority opinion makes mention that, in its opinion, defendant did not enter into the execution of the bill of lading until after the car was sealed, and points out that the railroad was, therefore, helpless to break the seal and consequently unable to make a thorough inspection. Now this was true of the defendant's position in the Davis case, for there defendant carrier was intervening carrier. The contract of shipment had already been entered into and the car was on its way, and intervening carrier would owe no more duty than that of making such inspection as was available and practical. Here, the defendant carrier was under no obligation to accept the contract unless satisfied, as it stoutly maintains that the record does not show that it furnished the car. Therefore, if it was true that this defendant railroad suffered this car to be spotted on its, the defendant's, tracks, for several hours, it must have expected to handle the car. It does not seem likely, nor within the realm of reasonableness, that this car would have been spotted on the defendant's tracks without its permission and knowledge. Defendant, under these circumstances, surely should have made some effort to be present when the car was to be inspected and re-sealed. But if the contrary, incredible though it seems, be true, and the railroad knew nothing of the matter (although Brown testified he had telephoned them about it), and simply entered into the bill of lading when presented, it certainly did so knowing the law applicable to the matter. There was no compulsion on defendant to do business in this way. It could have declined to execute the bill of lading until it was satisfied that the equipment was in good shape; and this writer feels that it was negligence and a calculated risk not to do so; and, of course, it would seem only prudent for the railroad to have made some inspection of the cargo it was to be responsible for shipping.

However, it is clear that many issues answered by the jury in this case were not supported by sufficient evidence and, in many cases, by no evidence at all. For example, the evidence with reference to the rotten canvas on the stiles in and about the doors of the railroad car. In the first place, we are not favored with a diagram, or anything like an adequate description of this type of car, or exactly where the canvas is fastened. We cannot tell, from the record, whether a reasonable inspection, after the car was sealed, could have revealed this rotten canvas, or not. Also, it must be noted that neither Brown nor Hamilton noticed anything wrong with the car in El Paso, and the evidence as to the rottenness of the canvas came from an inspection approximately four weeks later. Also, the evidence of witness Zinn, that the door was loose and ill-fitting, does not disclose whether it was loose and ill-fitting enough to permit the passage of air or, in other words, to permit the leakage of cold air. There is no evidence as to how much ice a shipment of this kind ordinarily would use, so that no comparison can be made. If the door was loose-fitting enough to admit hot air and leak cold air, it seems to me that this would be proof of negligence on the part of the initial carrier. The majority opinion points out that there is no evidence that the door was loose-fitting in El Paso; but, under the law as it now exits, the initial carrier assumes primary responsibility, and if the door became loose or ill-fitting in transit, the initial carrier would be primarily responsible.

Therefore, because of the state of the record and the evidence that it seems was, and should have been, available, I agree with the majority opinion that justice would be better served if the case were re-tried.

### On Motion for Rehearing

WILLIAMS, Justice.

In a very able Motion for Rehearing, the appellee complains of several holdings in our original Opinion. We will discuss the pertinent ones of these.

The appellee (plaintiff below) strenuously attacks our holding that the evidence was

insufficient to show that the meat in question was delivered to the railroad in good condition. He first relies on the two very recent decisions by the San Antonio court, to-wit, Missouri Pacific Railroad Co. v. Trautmann Brothers, Tex.Civ.App., 301 S. W.2d 240, and S. & D. Wolf Co. v. Atchison, T. & S. F. Railway Co., Tex.Civ.App., 301 S.W.2d 272. In these cases the bills of lading recited, "apparent good order", and no more. However, our bill of lading says:

"Received * * * The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) * * *."

Therefore, we do not consider the above authorities controlling. However, appellee also insists that the holding of insufficient evidence to show good condition must be set aside, since all assignments of error and points of error by the appellant stated that there was "no evidence" to support said finding and that, therefore, this court was without jurisdiction to find that the evidence was "insufficient." For this contention he cites Wisdom v. Smith, 1948, 146 Tex. 420, 209 S.W.2d 164. We have carefully reviewed the record in this regard, and we have come to the conclusion that the challenge of the jury's finding is not properly raised, either by assignment in the Motion for New Trial, or by point of error in the brief. In fact, we fail to find any assignment or point specifically challenging this finding of the jury. Wherefore, we withdraw our holding in the original Opinion that the evidence was insufficient to sustain the jury's finding that the meat was delivered in good condition, and we now find that holding by the jury should be, and the same is, respected.

The only other incident in the record wherein we said that the evidence was insufficient appears in the paragraph:

"We conclude that the evidence is insufficient to support the finding of negligence on the part of appellant in failing to inspect, and in failing to discover the defects, if any."

The purport of the whole paragraph, although we use that expression, is to hold that, as a matter of law, under the circumstances, the railroad was not negligent in not discovering the defects in the door, if any. Therefore, we think that the Wisdom case is not applicable to this point.

The sentence in our original Opinion,

"However, it seems this would not extricate the railroad from liability under the presumption above mentioned, had the merchandise been received in good condition",

is hereby withdrawn from the Opinion, because it is a correct statement of the law only when non-perishable property is involved. Here, we are dealing with perishable property, and a different rule applies, as will be hereinafter discussed.

The appellee strenuously assails our holding that the railroad was extricated from liability by the jury's finding that the negligence of someone other than the railroad was responsible for the spoilage. For this contention appellee says that a common carrier is an insurer of the goods it carries except for one of the excepted causes. For this contention he relies on 13 C.J.S. Carriers § 71, p. 131; 8 Texas Jurisprudence 227; and many other authorities. Unquestionably he is correct in this contention where the property carried is inanimate, non-perishable property. But here we are dealing with perishable property, and a different rule as to it applies. One theory is expressed in 8 Texas Jurisprudence 397, section 269, as follows:

"But it seems that a prima facie case is not made merely by proof that perishable property was delivered to the carrier in sound condition and was subsequently delivered by it in a damaged condition. In such a case the burden is on the shipper to show negligence where the inferences are conflicting as to whether the damage was

caused by negligence or natural processes."

See: St. Louis & Southwestern Ry. Co. v. Grant, Tex.Civ.App., 174 S.W. 714; Texas & P. R. Co. v. Woldert Grocery Co., Tex. Civ.App., 199 S.W. 1139.

These authorities go so far as to say there is no presumption. We think the better rule is expressed below.

█ It seems to us that many Texas cases have failed to differentiate between perishable and non-perishable property and, many of them at least, intimate that the rule is the same. However, we find that in a very recent case, Lee Roy Crawford Produce Co. v. Thompson, Tex.Civ.App. San Antonio 1950, 228 S.W.2d 344, Chief Justice Murray, after stating one rule to be as contended by appellee, above, that the carrier is an insurer except for the excepted causes, in the next paragraph recognizes that as far as perishable property is concerned, a different rule often applies, and cites Southern Pacific Co. v. Itule, 51 Ariz. 25, 74 P.2d 38, 42, 115 A.L.R. 1268. We have carefully read that case and think that it very logically and correctly states the rule as to perishable property. After relating delivery in good condition and receipt in damaged condition, it says:

"This, of course, was sufficient to sustain the burden of making a prima facie case."

It then says:

" * * * when the carrier shows affirmatively that it handled them in the method requested by the shipper, and that it exercised reasonable care to prevent any damage from any cause not necessarily involved in the method of transportation so chosen, that it has satisfied the requirements of the law in regard to the quantum of proof required to establish a defense to the action."

In 9 American Jurisprudence 947, section 844, after stating that a prima facie case is made out by a showing of delivery in good condition and receipt in bad condition, it is said:

" * * * a prima facie case of liability is made out, and the burden of proof is then on the carrier to show that damage was not caused by its negligence." (Citing cases.)

In the supplement to the above authority, it is stated that some courts hold that the railroad may extricate itself by showing that it was not negligent, while other courts "however, place upon the carrier the burden of proving the specific cause of the damage or injury, as a condition of avoidance of liability." In the instant case, as is shown by our original Opinion, the railroad showed that it was not negligent in icing and in carrying the property, etc. The jury, in the instant case, also found that the cause was the faulty door which we held, as a matter of law, was not chargeable to the carrier. The Itule case, above, holds with the first of these propositions, but in this case we do not have to rely on that only, although we agree that it is sound law, because in this case we have the added reason that the cause of the spoilage, the faulty door, was the negligence of someone other than the carrier. We therefore think our original Opinion is correct in this regard, and in its conclusion.

For a complete collation of the authorities, pro and con, concerning perishable property, see the annotations under the Itule case, in 115 A.L.R. 1268.

█ Appellant insists, in his reply brief to the Motion for Rehearing, that appellee, after pleading specific negligence, to-wit, the faulty door of the car, could not thereafter rely on the presumption above discussed. For this contention he relies largely on Myers v. Texas Land & Development Co., Tex.Civ.App., 282 S.W. 919. That case does not make it clear whether the plaintiff plead these causes in the alternative, or not, but regardless of this, we think the better rule is expressed in Texas & N. O. R. Co. v. Willis, Tex.Civ.App., 94 S.W.

2d 235, wherein it is held if the pleading is in the alternative, plaintiff's failure to prove the specific negligence does not prevent him from falling back upon the presumption. Plaintiff herein plead in the alternative. Therefore, we hold the presumption above discussed was available to the appellee in this case, but that same was overcome.

 This case involves an interstate shipment and is, therefore, under the Carmack Amendment (49 U.S.C.A. § 20(11)), and therefore the Federal authorities and law control. Cleburne Peanut & Products Co. v. Missouri K. & T. R. Co., Tex.Com. App.1920, 221 S.W. 270.

The doctrine of contributory negligence does not apply. Lee Roy Crawford Produce Co. v. Thompson, Tex.Civ.App. San Antonio 1950, 228 S.W.2d 344–348.

Therefore, this case if tried again should be submitted under the theory of apportionment of damages. Thompson v. Bob Tankersley Produce Co., Tex.Civ.App. San Antonio 1956, 289 S.W.2d 840.

Finding no error in our original Opinion, except the one first above corrected, the Motion for Rehearing is overruled.